Thank you, Your Honor. May it please the Court, my name is David Meaders and I represent Ms. Lisa Hollier. One thing to note that almost looks like a three-hole punch in front of you is the microphone, so when you have papers rattling over it, that gets picked up on the audio as well. My argument today is going to focus on our single point of error, which is that the government failed to prove with sufficient evidence that Lisa Hollier, the pharmacist in this case, knowingly joined an agreement and conspiracy to distribute controlled substance outside the scope of the professional practice and not within a legitimate medical purpose. The main basis for her argument in our point at trial was that there was no direct evidence of an agreement by Ms. Hollier and any of the other co-conspirators, and specifically Dr. Pedrone, who testified at trial that not only did he not have an agreement with Ms. Hollier as part of the conspiracy, but he also took action or took steps to hide his conduct from Ms. Hollier and the over 260 other pharmacists that filled prescriptions during the conspiracy. Every other co-defendant or cooperating co-defendant that testified said they did not have an agreement and did not discuss this with Ms. Hollier during the time period of the conspiracy. Were you trial counsel below? Yes. Because the Rule 29 argument was really brief. It's one sentence on the conspiracy, and it's one sentence again, then you file your motion for a new trial. There wasn't much given to the district court on this point that you're making, which is a difficult point. I think you're right. The jury had your argument, right? No agreement. The doctor says no agreement. Where's the agreement? Jury had it. Also, in the circumstantial evidence, you had conduct by Ms. Hollier that was inconsistent and, we would say, contrary to the government's theory of the case and of someone who is a knowing participant in a conspiracy as her role as a pharmacist. I think these cases are especially difficult because every pharmacist that filled one of these prescriptions advanced the . . . You got a mere presence instruction. You got the great caution listening to a government flip instruction, so it's all there for the jury. Yes. Then, to us, you give us just two cases on insufficiency, and the only Fifth Circuit case you give us is Gonzales, where we affirmed a conspiracy. What's your best case that there isn't enough proof of an agreement? Your Honor, in our reply brief, we also added a couple of other cases, but we were . . . Those cases, your time's short. You relied on the equal must reverse theory. Didn't we last year overturn that? Yes, Your Honor. Why are you citing a case that last year we said is no longer good law? Well, the argument was going towards, and where we struggled in our argument on appeal is where you have someone who, by their actions, like this pharmacist, just by filling the prescription, she advances the conspiracy, just like any of the other pharmacists that did it. Right. Going to that extra level of knowledge, so the cases that we tried to cite were the cases where there were discussions or analysis by this court of knowledge that went beyond just the person's actions. What's the best case you cited? I didn't find one in your briefing. You cited the equipoise theory that doesn't work. Right, but we also pointed out to the . . . in the facts and also in the . . . No. That's incorrect. And I can supplement with the best case that I can do, but at this point, I'm drawing a blank. We'll give you one more minute.  Thank you, Your Honor. Again, coming back to the circumstantial evidence, if you look at Ms. Hollier's conduct, as someone who is alleged to be a participant and a conspirator in this case, she took actions that would be directly contrary to that, and as a pharmacist, I mean, she didn't fill prescriptions early. She routinely used Medicare, Medicaid, and insurance, which in Medicaid and Medicare don't reimburse at the same level as . . . There was eyewitness testimony that she gave prescriptions to one person for many people. Yeah, but there was also . . . there was one witness who did that, Ms. Smith, but there was also Irene Pena, who worked with her, was a co-worker and an employee of Urban Pharmacy, and said that that never happened. And in the video . . . Now you're going to count two anyway, right? Right, but it also . . . Irene Pena is a government witness, and her testimony, I think, is probably the most important because it reinforces the argument that Ms. Hollier's conduct was not that consistent with someone that was part of the conspiracy. I thought there was evidence that a fellow at Birkin's, I think, is Irish, and she was aware, and he picked up a bag, a whole bag of these prescriptions and so forth. Yes, Your Honor, Ms. Smith testified that she saw Birkin's did that. She didn't give a date, a time, or an instance that wasn't reflected on the videos that the employee, Irene Pena, directly contradicted that testimony at trial. All right, counsel. We have you briefed for the clarity of your argument. Thank you. May it please the Court? I'm John Helms. I represent Patricia Bryant, who is one of the defendants. Ms. Bryant was alleged to be one of the dealers, is what they called her at trial. Now they call her a herder. The government's theory is that if you are someone who brought in multiple patients to see Dr. Padron, then that meant you were a co-conspirator, and in Ms. Bryant's case, unlike the other defendants, there was uncontradicted evidence in the record that explained why that is not a reasonable inference that you could draw. Specifically, unlike the other defendants, Ms. Bryant was a caregiver. She had people who were low income and disabled that she would care for, some in her home, some in their homes.  She doesn't have medical training, but she would do things like help feed them, help bathe them, make sure they were taking their medications. The people that were under her care were low income and disabled, and Dr. Padron, the government's lead witness, acknowledged that those types of people typically need transportation, don't usually have their own car, even if they did, can't usually get around, and he said those were the kinds of people that Ms. Bryant was caring for. He also acknowledged, and it's pretty logical, that if you're someone who is having a hard time making ends meet, which Ms. Bryant was, according to the record, and you're caring for people who are low income and disabled, then it would make sense that you would take them in a carpool kind of situation, save money on gas, it would be more efficient. And so, the record actually indicates that Dr. Padron said that not all of his prescriptions were not legitimate, and his testimony was that he had no reason to deny that the people that Ms. Bryant were bringing had legitimate need for these medications. The same was testified to by Irene Pena, the government's witness who worked at Urban Independent Pharmacy. She said she had no reason to believe, from seeing Ms. Bryant, that she was doing anything improper or illegal. And when Dr. Padron had no way to say that Ms. Bryant was doing anything wrong, that was not the case with other people. He testified that he thought other people were selling the drugs that he prescribed. He didn't say that about Ms. Bryant at all. What was the relationship between your client and Alan Perkins? She's his mother. Was she the one who had gotten re-addicted prior to this, or am I remembering defendants wrong? Had gotten re-addicted? Had been addicted before, and that was her defense given to the jury at all? Oh, no, Your Honor. There was testimony that Ms. Bryant had taken care of a woman who had been addicted to crack and cocaine, and that she had helped to get her off of it. There was testimony that Ms. Bryant was initially a patient of Dr. Padron's, and Dr. Padron testified that she legitimately needed the medication that he prescribed. Go ahead, counsel. Thank you. Sir? Thank you. Thank you, Your Honor. May it please the Court, my name is Kevin Ross. I represent Appellant Mr. Walter Hudspeth. Your Honor, the issue that I am focused on this morning is the fact that I do not believe that the government provided sufficient evidence to prove up to a reasonable jury that Mr. Hudspeth had an agreement to violate federal drug laws. Specifically, in this particular case, that in which to prescribe and dispense hydrocodone and other medications outside the scope of professional practice and without a legitimate medical purpose. In looking at the evidence that was presented in this case, especially when you focus on the evidence and testimony from Dr. Padron, what we first start off with is the government says that there is an agreement between them, but really the only conversation and testimony that Dr. Padron directly had with Mr. Hudspeth was a patient referral agreement, which he agreed that he would pay $30 to Mr. Hudspeth for every patient that he would bring to Dr. Padron's clinic. Dr. Padron testified at court that he didn't believe that there was anything wrong with four patients who came to his clinic. I thought there was testimony attributing a statement about snitches being dealt with to your client. That was from a co-defendant for Mr. Wade in which that statement was attributed to that, to Mr. Hudspeth. However, if you look at the other evidence as far as was there an agreement, I don't believe that statement standing in and of itself, Your Honor, is credible coming from the co-conspirator. So if we focus on the aspects of what agreement was there, how would Mr. Hudspeth know that what Dr. Padron was doing in prescribing that medication was outside the scope, especially when there's testimony that Mr. Hudspeth, he wasn't present in the exam room. There was no testimony that he told Dr. Padron what to prescribe. Dr. Padron testified that some of the patients that he did see had legitimate medical purposes that he prescribed the medication for, but most did not. But again, if somebody at a pain clinic is saying that they are in pain, that is something that's not necessarily verifiable except for what they say, and then Dr. Padron prescribes. But there's no further evidence of an agreement to violate federal drug laws. The question becomes, well, there was insinuated that— Well, Dr. Padron, it's an unusual case in one sense in that the primary doctor flipped early and pretty well leaves not much room for defense counsel to run in terms of sufficient evidence. But I thought that he said that Hudspeth was the guy that pitched it to him, the whole deal. Well, I believe, Your Honor, that—then the question becomes, he pitched it to him. I think that's how the government characterized it, that he pitched it to him. But the evidence shows that all that the conversation was about when Padron was further questioned on it was the basis of how much money I'm going to give you per referral. There's no further evidence as far as Mr. Hudspeth knowing what Dr. Padron was going to do when he examined those clients and give the medication or not. And there's no evidence— You would bring him 10 to 20 patients a day, right? That's correct, Your Honor. And it was scheduled as well. And it was from a church group and from a homeless shelter. But the 20 patients, the 10 to 20 a day were all, by happenstance, seeking prescriptions for controlled substances. That is what Dr. Padron testified to. Well, the juror could credit that, of course. Well, understandably. I see that my time is up, Your Honor. Respond to the question. I'll go back and rebuttal. Well, no, no. Go ahead and finish your thought to Judge Higginbotham. Thank you, Judge Southwick. I appreciate that. Your Honor, the evidence, though, shows that Dr. Padron treated some people. And he said that they did have a legitimate need. And he says that most did not. But where is that distinguishing factor? It's in the exam room. And Mr. Hudspeth was not in the exam room. Ms. Bryant was. Mr. Hudspeth was not. This facility was originally on Ross Avenue. Where on Ross Avenue was it? I don't know the specific address, Your Honor, in regards to that. It was probably in the lower income area, possibly. I don't remember. Ross is in Galson, Ross, a trading house, a huge car lot there. It just struck me as an interesting place for a clinic. Thank you.  Thank you, Judge. Thank you. May it please the Court. Good morning. My name is John Stickles, and I represent Mr. Josephus Austin. Mr. Austin got in this case because, frankly, the investigating officers made a mistake. The way Mr. Austin got in this case was they put a poll camera on a telephone pole outside Dr. Padron's clinic and recorded everybody going in. Mr. Austin went in to see Dr. Padron because Mr. Austin was a legitimate patient of Dr. Padron. During the course of the investigation, the officers went through the video from the poll camera, which is rather poor quality, went through Dr. Padron's patient list, and kind of matched up what they thought the picture looked like to the person on the patient list. Unfortunately, in Mr. Austin's case, they made a mistake and incorrectly identified Mr. Austin as, now they call him herders, bringing people in to see the doctor. It is uncontroverted that Mr. Austin was a legitimate patient of Dr. Padron. The officers' identification of him as a herder is shoddy at best. During the course of the trial, the officer admitted that his identification might be wrong, and he admitted that if he identified him wrong, then Mr. Austin was not responsible for what they're saying he did. There's no evidence that Mr. Austin was any part of an agreement. There's no evidence or insufficient evidence that Mr. Austin had any knowledge of any kind of agreement, and there's no evidence or insufficient evidence that Mr. Austin had any agreement to voluntarily participate in this conspiracy. I wish you'd flesh out a bit your reliance on this camera. Didn't Dr. Padron himself say that Austin often visited? So at most or at worst, the camera may have caused a misidentification at times, but there is other evidence that he came fairly frequently to the clinic. Yes, sir, that's exactly correct. With Hudson. He was there on January 5th when the raid occurred, too, wasn't he? Yes, sir, he was there on January 5th. He was in the appointment book and had an appointment to see Dr. Padron for his pain medication. There's legitimate reason for him to be there on that date. Thank you. Thank you, Your Honor. Well, we'll see if the government has a different point of view. May it please the Court, Brian Portugal for the United States. Thank you. Let me ask you a question. In this case, you got the plea of the doctor, prescribing doctor, and he gave you the testimony and pretty much with everybody down the line. But then when it comes to one of the defendants, he unhesitatingly said there was no agreement with him. In fact, extensively attempting to exonerate them. Now, you don't have to accept that, but the government puts forward this key witness, the lead witness, who's pled guilty himself and he's a doctor and he's laying it out for the jury. That's a very powerful case to go to trial on. But then you vouch, in essence, for the veracity of this doctor and asking for the conviction of all these defendants, but then you don't take the testimony when he exonerates one of them. Well, I think a fair reading of that testimony by Dr. Padrone as to Ms. Hollier, that he had no agreement with her. I think a fair reading of that and a fair inference from the jury and a fair way of witnessing. He wasn't, as I understand it, saying that in a technical term we didn't have an agreement. I thought he was saying basically there's no agreement. He's denying that she's a participant. I'm at least reading that. I don't take the testimony that way, Your Honor, and certainly the jury didn't. The reason is because I think what Dr. Padrone was trying to indicate was he didn't have a monetary arrangement with Lisa Hollier to perpetuate this scheme. When you ask someone do you have an agreement, I think the natural way a witness would hear that and a jury would hear it is was there an exchange of consideration for any kind of service rendered? And there wasn't any evidence of that here. He didn't have a formal agreement as such with anybody else either, but he testified. He didn't say that about any other defendant, and it was the same pattern of operation essentially. That's correct, but all I can do, Your Honor, is offer the government's view and what I think the jury would have taken it as. That didn't seem to me the government's view, right? Because the concessions that Padrone made were on cross, on redirect. There was no effort to clarify that you only meant no cash agreement. That wasn't the redirect by the government. There was not redirect on that. In fact, he was asked explicitly did you ever give her cash. He said no. That was a separate question from where he said she had no agreement. That's correct. That is the record, Your Honor. How many times did he say he'd ever even met Ms. Hollier? I don't think he ever said he never met her. How many times? He said he met her how many times? The one time when she proposed by phone that they meet to discuss how prescriptions would be transmitted from his clinic to her pharmacy. In that respect, Your Honor, his testimony that he doesn't have an agreement is simply incorrect, or it contradicts his earlier testimony that henceforth the way prescriptions would be transmitted between his clinic and her pharmacy would be by fax. She's the only co-defendant that's a pharmacist. That's correct. So the government's theory of this case is that one time they met an agreement was hatched? Well, that's certainly evidence of an agreement. He then said there was no agreement. She's the one defendant that gets no cash. She gets no cash, but she gets almost 5,000 prescriptions from his clinic to her pharmacy that she has an ownership interest in. So, I mean, there is a financial incentive for her to have this arrangement and to turn a blind eye to bogus prescriptions. In your brief to us related to Ms. Hollier's guilt at 24 and 25, you emphasized that she isn't attacking the count two substantive offense that would be supported by the pharmacist's claims that this is big red flags. Was that an incorrect statement? Yes, that is, and I intended to say that right up front in this argument. Count two was actually dismissed before trial, Your Honor. At the government's initiative? That's correct. So that argument that we should not credit the insufficiency evidence is just wrong in the brief? That is correct. I apologize for the error. Do you remember in your entire discussion with Ms. Hollier, did you support it with any case citation for sufficiency as to a conspiracy agreement when the flip government witness is saying there is no witness agreement? I don't recall citing any case that says that, Your Honor. Do you remember the one case you cited? It was . . . Casillas? This is just a difficult case. I share Judge Higginbotham's concern. This is the only pharmacist, and you did develop a lot of expert testimony about red flags, look at the volume she's treating, look at what she's doing in the pharmacist. That would all go to count two. Then in your brief you say, well, she's guilty because she didn't attack count two. But as to count one, your agreement theory, where's the proof of an agreement? I think all of that evidence also goes to count one, Your Honor, because the conspiracy was charged to distribute the hydrocodone. But it has to be knowledge of the conspiracy charged. It can't be knowledge of illegal activities generally. I understand, Your Honor, but I think that the evidence of the red flags, the meeting with Dr. Padron, the evidence of one of the co-conspirators picking up prescriptions for another person, the fact that Irene Pena, who worked at the pharmacy, testified that Ms. Hollyer personally reviewed every single prescription, the fact that Ms. Hollyer, the pharmacist, wanted Dr. Padron's soap notes and the expert testimony that that would be unusual, but if you got them you should look at them, and any pharmacist would notice that every— I think that goes to count two. Does the record reflect why you moved to dismiss count two, the only substantive count against her? I don't think it reflects that. I think it was simply a streamlining in preparation for a trial. Well, isn't there evidence that even though she was a primary filler of these prescriptions, there were several other pharmacies that were filling the prescriptions? I'm sorry, what was the— Are there other pharmacies that were filling these prescriptions, not just Hollyer's? There were, but there— There is also evidence that at least two pharmacies got sufficiently worried about the kinds of things you're talking about that they stopped filling Dr. Padron's prescription? That's correct, Your Honor. So the sense of that is that Hollyer, somebody who decided not to go that direction, without any agreement with Dr. Padron, willing to make the money of all these extra prescriptions, violating probably consciously certain laws, but that doesn't make it evidence of her knowing participation agreement with Dr. Padron. It seems to me she's like Walgreen and CVS, who I think were the two who dropped filling his prescriptions. She became as aware as they did of what was going on, maybe, but was not willing to forego that income. That's not enough, is it? Well, that may not be enough, but that's not all there is. Well, let me ask you, is that enough? You can tell me there's more to this case, but is that enough just to her knowledge that probably something improper is going on and she's still willing to reap the financial benefit of it? Doesn't she have to enter some sort of agreement with Dr. Padron? I think she has to have some agreement with some other co-conspirator. And I think that the sheer volume of the prescriptions, the fact that the complaints in the soap notes are all generic, are all identical. Are you saying that the premise for her agreement was not with Padron, it was some other co-conspirator? I think it was with Padron and with these folks that would bring in the patients in groups into her pharmacy and fill prescriptions for hydrocodone for all of these people. Did you argue that she was knowingly aiding and abetting a drug appeal operation? I certainly think she was aiding and abetting it. I don't think that it was charged that way. Well, I assume the indictment also includes aiding and abetting, but maybe it didn't. Aiding and abetting is not a basis for sustaining her conviction. Is that what you're saying? I apologize, Judge Higginbotham. I can't recall if it had. I want to say that the indictment did not charge aiding and abetting because I reviewed it and thought it was unusual, but I might be wrong about that. Well, okay, if she's not charged with aiding and abetting, then you're . . . So she was independent. And your argument, as I understand it factually, is that she was receiving a large number of prescriptions, and I don't know what percentage of her business, if any of the evidence shows, were those prescriptions. That's one question I have. And I have a follow-up to that, depending on your answer. Special Agent Stapleton testified that after reviewing records, he believed that I think it was close to 50% of the prescriptions that were filled at her clinic were for controlled substances. And they weren't just for controlled substances. They were for these particular, the same. I thought that the evidence was that all of those prescriptions were for the same controlled substance. Yes, that's hydrocodone, Xanax, or Alprozolam is the generic. Well, this was a pill operation, and this was a red flag, and she certainly knew that that was going on, and that she aided and abetted it. Right. Or maybe she aided and abetted it. We're not sure whether that . . . I'll leave that alone, and you can tell us whether or not you . . . Hollier's brief says that Dr. Padron testified that he did lie to all the pharmacists, as distinct from the other co-conspirators. Is that a correct statement of the record? It is, but as with all things in the record, there is some nuance to it, in that when he said he lied, what he meant was, and this is, if you read that testimony, that portion of the testimony in its entirety, when he says he lied, what he means is the prescriptions are bogus, they're fraudulent. That's what he . . . He wasn't denying that they knew that he . . . Is that how you're interpreting that? Right. The testimony was, these prescriptions are fraudulent. Yes. So that means you lied. Yes. So that's in context, that's what it is that he lied. Did you ask for a willful blindness instruction as to Hollier? No. No, Your Honor. That can't be the basis for knowledge of an agreement. That's correct, and there was none in the charge. Let me ask you about Austin. You certainly know what the argument is. Austin was just a bystander for this. What is the evidence of the frequency with which he was there? Opposing counsel starts with this camera, but there is direct evidence, testimony of Austin's presence. Summarize that for me. It does seem to me he's at best a pretty minor participant and maybe just a bystander, which is what I'm concerned about with Austin. Certainly, Your Honor. Cassandra Flores, who worked at the Padron Clinic, testified that Austin came in over 40 times in the eight months that she worked there. He's in the cash logs for the clinic, which is Government Exhibit 4. Forty times in eight months. He was actually getting prescriptions himself for his personal use. Any correlation or any drawing out of that, how many times he needed to be there just for his own medical care? He would have been there for himself a maximum of once every 30 days because that's how often you can prescribe hydrocodone. My friend at the bar makes mention that Austin was not in the room. Well, he was in the room, Your Honor. He was in the room for his own patient visits when he was getting hydrocodone prescriptions for himself. In addition to being at the clinic that frequent and that many times in eight months, again, the government's Exhibit 2 at page 99, 242, 266. He's in the cash logs shown as paying money for his visits. Co-conspirator Alicia Smith identified Austin as a person she knew to be involved in the same scheme that she was involved in, that is the overarching scheme of obtaining these prescriptions and later selling the pills. Austin admitted to Special Agent Andre Byers in an interview that he transported homeless persons from the bridge, which is a homeless shelter in Dallas, to Padron's clinic. And Padron testified that Austin was in effect Hudspeth's assistant in this enterprise and frequently came with Hudspeth with the patients, transporting them to the clinic. So that's... Austin, Padron made some incriminating statements after the lunch and there was some dispute about whether he'd been coached, but cross-examination was allowed to that and all before the jury? Right. I'm sorry. Austin is also on a government exhibit. I think it's one of the early exhibits as he's on a list that the clinic maintained of persons who brought in patients and paid cash for hydrocodone. To put this in perspective, as I understand the record and from these cases in general, you bring in homeless persons and they all have a pain problem. The other side of the coin is that they have an addiction problem, and these drugs are common knowledge, and we see this, are precursors to heroin. And the first time you shut down one of these clinics, then the heroin sales go up. If you're dealing with... My suggestion to you is that that's the atmosphere in which these physicians are operating. And unfortunately, a lot of these people do need pain medicine for the health reasons, for legitimate health reasons. So then you're into numbers and also the source of it. So what you're arguing, as I understand it, is you have a lot of these homeless persons being brought in and one of the reasons why they're homeless is a drug addiction. But circle back to the second pharmacy. She organized and suggested a streamlining of this process for processing those. Is that correct? That's correct. And what was the operative effect of that, the way it was streamlined, in terms of disclosing her, identifying her as a participant, if any? Well, I think that the streamlining was also a cover for the... You argue that, and why was that? I don't know what we mean, the details of streamlining here would be, but I assume that you are arguing that by streamlining it, it took a form that it would not immediately disclose her participation. Explain that to me. It would provide her, ostensibly, with cover for filling the prescriptions because the soap notes that would be transmitted along with the prescription would be an ostensible justification for why this person needed hydrocodone. But it wasn't even really a good cover because all of the soap notes indicated the same generic diagnoses, back pain and anxiety. And so you have just droves of patients coming in. But if it's not effective, then why isn't it just an effort to streamline the process for business reasons, just legitimate business reasons, if it would not, in fact, cover? What struck me is if all these are being written for the same thing, the inference to be drawn from there remains, despite the streamlining process, and you relied heavily on the streamlining process, if I understand it, in your arguments. Well, I think, in fairness, Your Honor, the inference could go that way, but the jury found that it went the other way. And as I know the court is very experienced in hearing these conspiracy to commit or to distribute drugs, some folks just aren't very good at covering what they're doing, and I think that's what happened here. The ones that are called aren't. I'm sorry? The ones that are called aren't. Right. Thank you. If the court has no further questions, I'll cede the remainder of my time and ask you to affirm the judgment below. All right, counsel. Judge, to address the first issue, there was no aiding and abetting as part of the indictment. The government wants to focus on the meeting, the one single meeting between Dr. Padron, Ms. Hollyer, and the majority owner of Urban Pharmacy. It's true after that that the prescriptions were faxed directly to Urban Pharmacy instead of coming through with the individuals and that soap notes were attached. The evidence at trial was that Urban Pharmacy had had a problem with forged prescriptions that Ms. Hollyer had actually called the Dallas Police Department and their diversion division. Ms. Irene Pena recognized the names of the officers who came and visited the pharmacy to deal with the forged prescriptions. Again, we would argue that that's not consistent with somebody who's in a conspiracy, at least from the role as a pharmacist. And quickly, Government Exhibits 100 and 101 were spreadsheets created by the case agent. Specifically, Exhibit 101 shows that Urban Pharmacy filled controlled and non-controlled prescriptions and that during the time period, only 22% of the controlled prescriptions at Urban were from Padron. Also going back to Dr. Padron's testimony, he made the statement, and it's in the record, at 1410843.969 where he says that the intent of his initials on the prescriptions was that to give the pharmacist a belief or something that they could rely on that the patient had actually been seen by the doctor. And that that was his effort to hide his conduct from the pharmacists who were filling these prescriptions. Thank you. Just to clarify a couple of things. There was no evidence that Ms. Bryant received any cash, unlike potentially others. And Dr. Padron never said he had an agreement with her of any kind. He didn't deny that her people had a legitimate medical need, and he said she brought fewer people than the others. He didn't say she was selling, didn't think she was selling drugs or her patients were selling them, and he did say that about others. And there was no testimony that she picked up homeless people or did anything like that. All right. Those clarifications. Thank you, Your Honor. Your Honor, briefly, what's undisputed in regards to Mr. Hudspeth, and I've cited that in my brief, that he was a legitimate patient of Dr. Padron initially. He did have a pain problem. He did go to his clinic. It wouldn't be uncommon for him to be at the clinic. It's undisputed that he brought patients to the clinic for Dr. Padron. It was a pain medication clinic or pain management clinic. He went. He brought people. He facilitated getting them there. Innocent activity, it could be viewed as. There's nothing illegal with bringing people to a pain management clinic. The gist of it is where do we get to the agreement for the conspiracy to dispense these hydrocodone outside the scope of professional practice and without a legitimate medical purpose? I mean, Mr. Hudspeth was not in the examination room. And it's Dr. Padron's testimony that he prescribed these medications to some that were legitimate and sometimes not. But, again, there was speculation by Dr. Padron that perhaps Mr. Hudspeth was taking the medications and going out and selling it on the street. But I think that when you look at that testimony on cross-examination, you see that that's just purely speculative. And he had no knowledge of that. And nobody else pointed to Mr. Hudspeth doing that kind of activity. So then the question becomes, is it illegal for Mr. Hudspeth to receive money or financial benefit for referring patients to his clinic? Initially, he got $30 for each person that he brought. And then it moved to where Dr. Padron stated, I'm not going to pay you anymore. You know what I'm going to do? I'm going to give you a free office visit. He got free medication himself. I don't believe that he got free medication, Your Honor. I don't believe that. I believe that he got his, from the testimony in the record, it states that he received free office visits. I'm sorry? That he received free office visits and free exam. I think that's the testimony from the record. I don't think there's any testimony that he received free prescriptions. I may be mistaken, but I don't recall that. All right. Thank you. Thank you. Thank you. It is true that there was evidence, testimonial evidence, that Mr. Austin had been in the clinic over 40 times in an 8-month period. However, the testimony was also very clear that Dr. Padron's office kept meticulous records about who came in the office when and who they brought into the office. The evidence, the testimony was that according to the patient's ledger and the appointment calendar for Dr. Padron, the only time Mr. Austin's name appears in that calendar is when he came in for his own medical consultations, for his own appointments. It does not appear anywhere else, unlike the other people here who appeared in the calendar multiple times. Judge Higginson is correct. Mr. Austin is only in this case after Dr. Padron took lunch during his debriefing, talked to his lawyer, and came back in the afternoon and said, oh yeah, it's Mr. Austin that was here. I think the testimony in this case is clear that Mr. Austin was misidentified by the officer from the very first part of the investigation, and that the only reason he's here is that the officer made a mistake, misidentified him, and the real person that did it is out there somewhere. Thank you. All right. All four of you have taken on a somewhat difficult case, common facts and trying to distinguish your clients. You've done able jobs. We appreciate your willingness to take that on. Commending you in no way tries to slight the government, but we appreciate attorneys being willing to take court appointments. We'll take a brief recess.